**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**SAN ANGELO DIVISION**


|  |  |  |
|---|---|---|
| | § | |
| **ROBERTO A. RODRIGUEZ,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Civil Action No. 6:04-CV-0023-C** |
| | § | |
| | § | |
| **JO ANNE B. BARNHART,** | § | |
| **Commissioner of Social Security,** | § | |
| | § | |
| **Defendant.** | § | |


## REPORT AND RECOMMENDATION

**THIS MATTER** is before the court upon Plaintiff's complaint filed April 14, 2004, for

judicial review of the administrative decision of the Commissioner of Social Security denying

Plaintiff's applications for disability insurance benefits and supplemental security income benefits

under Titles II and XVI of the Social Security Act. Plaintiff filed a brief in support of his

complaint on September 7, 2004, Defendant filed her brief on October 27, 2004, and Plaintiff filed

his reply on November 9, 2004. The United States District Judge, pursuant to 28 U.S.C. § 636(b),

referred this matter to the United States Magistrate Judge for report and recommendation, proposed

findings of fact and conclusions of law, and a proposed judgment. This court, having considered

the pleadings, the briefs, and the administrative record, recommends that the United States District

Judge affirm the Commissioner's decision and dismiss the complaint with prejudice..

### I.   STATEMENT OF THE CASE

The procedural history of this case is both lengthy and complicated. Plaintiff filed an

application for disability insurance benefits on June 5, 1997, alleging disability beginning

December 4, 1995.  Tr. 49-52.  Plaintiff's application was denied initially and upon reconsideration.

Tr. 27-31, 34-37.  Plaintiff filed a Request for Hearing by Administrative Law Judge on October 28,

1997, and this matter came for hearing before the Administrative Law Judge ("ALJ") on

September 15, 1998.  Tr. 38-39, 166-88.  Plaintiff testified in his own behalf.  Tr. 170-80, 183-88.

A vocational expert ("VE"), Barbara Dunlap, testified as well. Tr. 180-82. The ALJ issued a

decision unfavorable to Plaintiff on November 12, 1998.  Tr. 12-24.

In his opinion the ALJ found that Plaintiff had not engaged in substantial gainful activity

since December 4, 1995.  Tr. 17.  The ALJ noted that although Plaintiff had worked as a dishwasher

after the alleged onset date of disability, such work constituted an unsuccessful work attempt.  *Id*.

He found that Plaintiff had severe impairments including chronic cervical radiculopathy, status post

fusion at C4-5 and C6-7, bilateral ulnar palsy, and impaired left eye vision.  *Id*.  The ALJ found

these impairments, considered singularly or in combination, did not meet or equal in severity any

impairment in the Listing of Impairments, 20 C.F.R Pt. 404, Subpt. P, App. 1.  *Id*.  The ALJ noted

that no treating or examining physician has mentioned findings equivalent in severity to the criteria

of any listed impairments.  *Id*.

The ALJ further found that although Plaintiff has medically determinable impairments that

could reasonably cause some of the alleged subjective symptoms, his statements concerning his

impairments and their impact on his ability to work were not entirely credible in light of the

Plantiff's own description of his activities and lifestyle, the degree of medical treatment provided,

and the discrepancies between the Plaintiff's assertions and other evidence in the record.   Tr. 20.

 He found that Plaintiff retained the residual functional capacity ("RFC") to perform the exertional

demands of light work, limited to jobs with no requirement for fine manual dexterity or fine visual

acuity and that involve no more than occasional use of the upper extremities.  *Id*.  Relying upon the

testimony of the VE, the ALJ found that a person with Plaintiff's vocational history and with the

RFC for light work subject to the noted limitations could not perform Plaintiff's past relevant work. Tr. 20-21. He further relied upon the testimony of the VE that such a hypothetical person would be able to perform jobs which exist in substantial numbers in the national economy, including the jobs of surveillance system monitor, with 3,000 jobs in the state and 60,000 jobs in the nation, and usher, with 4,000 jobs in the state and 70,000 jobs in the nation. Tr. 21. The ALJ, therefore, concluded that Plaintiff was not under a disability and was not eligible for benefits under the Social Security Act. Tr. 22, 24.

The Appeals Council denied Plaintiff's Request for Review of the Hearing Decision/Order on May 23, 2000, after allowing an extension of time to submit evidence and/or arguments. Tr. 4-8. While the original application was pending, Plaintiff filed a duplicate Title II application and a new application for supplemental security income benefits with a protective filing date of May 31, 2000, alleging disability since December 4, 1995. Tr. 208. The Appeals Council thereafter determined in its opinion dated May 23, 2000, that there was no basis for granting Plaintiff's request for review. Tr. 4. Plaintiff filed a complaint in the United States District Court on July 25, 2000. Tr. 299-300. The Commissioner filed a motion to remand for further administrative proceedings, which the court granted. Tr. 301. Upon remand to the agency, the Appeals Council vacated the ALJ's decision and remanded the matter for further proceedings. Tr. 309-10, 312-13. The ALJ apparently scheduled two consultative examinations and, after Plaintiff did not appear, issued a notice to show cause for failure to appear. Tr. 327. Plaintiff's representative indicated that Plaintiff was not informed of the examinations and asked that they be rescheduled. Tr. 326. A second hearing before the ALJ took place on January 28, 2002. Tr. 265-96, 318-24. Plaintiff, represented by a non-attorney, appeared and testified in his own behalf. Tr. 267-87, 294-96. A VE, Carol Bennett, appeared and testified as well. Tr. 287-93.

The ALJ issued a second unfavorable decision on March 21, 2002. Tr. 219-32. Plaintiff submitted exceptions to the decision on July 30, 2003. Tr. 198-202. The Appeals Council issued an opinion on June 15, 2002, remanding the matter to the ALJ to reschedule the consultative examinations, update the medical file, reevaluate Plaintiff's RFC in light of these examinations, and obtain further VE testimony, if appropriate. Tr. 196-97.

This case came for a third hearing before the ALJ on March 24, 2003. Tr. 234-64. Plaintiff, again represented by a non-attorney, appeared and testified in his own behalf. Tr. 237-60. A VE, Shelly Eike, appeared and testified as well. Tr. 260-64. The ALJ issued a partially favorable decision on June 26, 2003. Tr. 203-18.

In his opinion the ALJ noted that Plaintiff's representative had asked that his disability onset date be amended to November 13, 1998. Tr. 209. The ALJ found that Plaintiff met the disability insured status requirements from the alleged onset date through March 31, 2001. *Id.* He noted that to be entitled to disability insurance benefits, Plaintiff must show that his period of disability began prior to the expiration of his insured status. *Id.* He found that Plaintiff had not engaged in substantial gainful activity since November 13, 1998. *Id.* He found that Plaintiff has severe impairments including severe degenerative disk disease, status post cervical fusion; history of left elbow entrapments, status post surgical intervention; history of left shoulder rotator cuff tear, status post surgical repair; history of anemia secondary to hemorrhoids, status post hemorrhoidectomy; reduced visual acuity; and a diagnosis of mild mental retardation versus borderline intellectual functioning. Tr. 209-10. The ALJ found that these impairments, singularly or in combination, did not meet or equal in severity any impairment in the Listing of Impairments. Tr. 210. He also found that Plaintiff had a non-severe impairment, gastritis. *Id.* He specifically found that Plaintiff's reduced intellectual functioning did not meet or equal the severity criteria for § 12.05C of the Listing of Impairments. Tr. 214. He found that there was no evidence of onset prior to age 22 and Plaintiff's history of semi-

skilled work suggested a higher level of functioning than was implied by IQ testing alone.  *Id*.  The ALJ noted that the psychological consultative examiner had indicated that Plaintiff is functioning in the mildly mentally retarded range intellectually, with perceptual organizational abilities which were as high as the "borderline" range of intellectual functioning.  Tr. 213.  He noted that Plaintiff was functionally illiterate, with math and reading disorders.  *Id*. He also noted that the CE had opined that Plaintiff had no more than a fair ability to make occupational, performance, and personal/social adjustments.  *Id*.  The ALJ opined that Plaintiff had demonstrated in the past that he retains the mental ability to perform at least simple (i.e., unskilled) job tasks despite these mental impairments and noted that there was no evidence showing any injury or illness which has caused Plaintiff to suffer any reduction in intellectual capacity.  *Id*.

The ALJ ultimately found that during the period from November 13, 1998, through June 14, 2002, Plaintiff retained the residual functional capacity to perform work at the light exertional level, limited to jobs with a 15-pound weight restriction on lifting/carrying; no requirement for overhead use of the upper extremities; no requirement for climbing of scaffolds or ladders or crawling; only simple, repetitive work with instructions to be communicated orally in simple English; and a requirement for only occasional bending, reaching, kneeling, and squatting.  Tr. 216-17.  The ALJ relied upon the testimony of the VE, who indicated that a hypothetical person of Plaintiff's age, education, and vocational history, with the RFC for a limited range of light work as noted, could perform the jobs of small products assembler, with 110,000 jobs in the nation and 6,600 jobs in the state; small parts inspector, with 75,000 jobs in the nation and 7,000 jobs in the state; and conveyor tender, with 10,000 jobs in the nation and 1,500 jobs in the state.  Tr. 216.  The ALJ therefore concluded that during the period from November 13, 1998, through June 14, 2002, Plaintiff was not under a disability.  Tr. 217.  He found that Plaintiff had not demonstrated his disability prior to the expiration of his insured status and concluded he was not entitled to a period of disability and

disability insurance benefits under Title II of the Social Security Act. *Id*. The ALJ found, however, that Plaintiff was under a disability since June 14, 2002, through the date of his decision and was entitled to benefits under Title XVI. *Id*.

Plaintiff submitted exceptions to the ALJ's decision on July 30, 2003. Tr. 198-202. The Appeals Council apparently denied Plaintiff's request for review of the hearing decision. Pl. Brief at 4; Def. Brief at 3. The ALJ's opinion thus became the final decision of the Commissioner.

On April 14, 2004, Plaintiff commenced this action which seeks judicial review of the unfavorable portion of the Commissioner's decision that Plaintiff was not disabled for the period from November 13, 1998, through June 14, 2002.

## II.   STANDARD OF REVIEW

An individual may obtain a review of the final decision of the Commissioner by a United States District Court. 42 U.S.C. § 405(g). The court's review of a denial of disability benefits is limited to determining whether the decision is supported by substantial evidence and whether the Commissioner applied the proper legal standards. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002)(citing *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000)). Substantial evidence "is more than a mere scintilla and less than a preponderance" and includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002); *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). The court will not re-weigh the evidence, try the questions *de novo*, or substitute its judgment for the Commissioner's, even if the court believes that the evidence weighs against the Commissioner's decision. *Masterson,* 309 F.3d at 272. "[C]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id.* (quoting *Newton v. Apfel,* 209 F.3d 448, 452 (5th Cir. 2000)).

In order to qualify for disability insurance benefits or supplemental security income, a claimant has the burden of proving that he or she has a medically determinable physical or mental

impairment lasting at least 12 months that prevents the claimant from engaging in substantial gainful activity. Substantial gainful activity is defined as work activity involving significant physical or mental abilities for pay or profit. *Newton,* 209 F.3d at 452. *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1527(a)(1).

The Commissioner follows a five-step process for determining whether a claimant is disabled within the meaning of the Social Security Act. 20 C.F.R. § 404.1520; *Masterson*, 309 F.3d at 271; *Newton*, 209 F.3d at 453.  In this case, the ALJ found at step 5 that Plaintiff was not disabled for the period from November 13, 1998, through June 14, 2002, because he retained the ability to perform work in the national economy during that period. Tr. 18

### III.   DISCUSSION

Plaintiff asserts numerous prejudicial errors by the ALJ and Appeals Council.  He argues that the ALJ erred at step 3 of the sequential evaluation process in finding that he failed to meet or equal in severity the criteria of § 12.05C of the Listing of Impairments.  He further argues that the ALJ erred by failing to evaluate the functional limitations imposed by his mental impairment under the "part B" criteria of the listings and to make the finding required by law and by failing to consider the limitations noted by the consultative examiner.  Plaintiff finally alleges that the ALJ erred in making his physical RFC assessment by considering all of his physical impairments in one analysis and by failing to appropriately consider that his impairments were worse prior to corrective surgery.

**A.**   **Whether the ALJ erred in finding at Step 3 that Plaintiff did not meet the criteria of Section 12.05C of the Listing of Impairments.**

Plaintiff argues that the ALJ erred at Step 3 of the sequential evaluation process in finding that his mental impairment did not meet the criteria of Section 12.05C of the Listing of Impairments. Plaintiff asserts several specific errors, including the failure of the ALJ to presume that Plaintiff's IQ scores were consistent throughout his life, the failure to shift the burden to the Commissioner to

show proof that Plaintiff's IQ was higher prior to his 22nd birthday, and the finding that Plaintiff's work history was inconsistent with mental retardation.  Plaintiff further alleges that the Appeals Council erred by requiring a diagnosis of mental retardation.

The record indicates that a psychological examination was performed on October 1, 2002, by R. Scot Brown, Psy.D., a psychologist.  Tr. 722-25.  Dr. Brown indicated that on the Weschler Adult Intelligence Scale - Third Edition ("WAIS III"), Plaintiff earned a verbal IQ of 64, a performance IQ of 67, and a full scale IQ of 62.  Tr. 723.  He indicated that these scores "would place [Plaintiff] within the Mildly Mentally Retarded range of abilities," with his Verbal Comprehension Index falling within the Mildly Mentally Retarded range and the Perceptual Organization Index falling within the lower limits of the Borderline range of abilities.  *Id*.  Dr. Brown opined that these findings "likely reflect [Plaintiff's] history of no formal education and bilingual upbringing."  *Id*.

Section 12.05 of the Listing of Impairments defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period;   i.e., the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. Pt.  404, Subpt. P, App. I, § 12.05.  This section indicates that presumptive disability under the Listing of Impairments is established "when the requirements in A, B, C, or D are satisfied."  *Id*.  Section 12.05(C) defines an impairment to include a valid verbal, performance, or full scale I.Q. score of 60-69 inclusive and a physical or other mental impairment imposing additional and significant work-related limitations of function. "A claimant must prove both of these conditions in order to meet his burden under step three."  *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990) (citing *Sullivan v. Zebley*, 110 S. Ct. 885, 891-92 (1990)).  "The claimant must provide medical findings that support each of the criteria for the equivalent impairment determination."  *Selders*, 914 F.2d at 619 (citing 20 C.F.R. § 404.1526(a)).

-8-

The ALJ noted that the psychological consultative examination revealed that Plaintiff "is functioning in the mildly mentally retarded range intellectually, with perceptual organizational abilities that are as high as the 'borderline' range of intellectual functioning," was functionally illiterate, and had math and reading disorders.  Tr. 213.  The ALJ found that Plaintiff's reduced intellectual functioning did not meet or equal in severity the requirements of § 12.05C of the Listing of Impairments "as there is no evidence demonstrating an onset of this impairment prior to age 22." Tr. 214.  The ALJ further found that the Plaintiff's history of semi-skilled work as a construction laborer suggested a higher level of functioning than is implied by IQ testing alone.

Plaintiff argues that he has met the requirements of Section 12.05C of the Listing of Impairments, having shown a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R. Pt. 4, Subpt. P, App. II, § 12.05C.  Plaintiff's argument is two-fold.  He argues that mental retardation is defined under the regulations as "a lifelong condition," citing 20 C.F.R. Pt. 4, Subpt. P, App. I, § 12.00(B)(4).  He argues that this definition creates a presumption that an IQ score for an adult accurately reflects an individual's IQ throughout that person's entire life and, therefore,  demonstrates onset prior to age 22.  As a result, he argues that the Plaintiff need not show onset prior to age 22; the IQ score in the requisite range is sufficient to meet the Listing.

Section 12.00(a) describes the structure for evaluation of mental impairments under § 12.05 of the Listing of Impairments:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings.  Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation.  It also contains four sets of criteria (paragraphs A through D).  If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A). This section clearly provides that in order to meet the Listing criteria for mental retardation, Plaintiff's mental impairment must first satisfy the diagnostic criteria — that is, "significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period." 20 C.F.R. Pt. 404, Subpt. P, App. I, § 12.05.

Plaintiff points to *Muncy v. Apfel*, wherein the Eighth Circuit noted that "[a]bsent evidence of a change in intellectual functioning, a person's IQ is presumed to remain stable over time. *See Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001). However, the presumption that Plaintiff's IQ has remained stable is insufficient to demonstrate that Plaintiff has met the criteria of Listing 12.05. Intelligence tests play an important role in verifying mental retardation but are not the sole measure. The Commissioner's *Programs Operations Manual System* ("*POMS*"),[1] which Plaintiff cites, describes the relationship of adaptive behavior to IQ scores. *See POMS* § DI 24515.056(D)(2). This section notes:

> [T]he term "adaptive behavior" refers to the individual's progress in acquiring mental, academic, social, and personal skills as compared with other unimpaired individuals of his/her same age. Indicators of adaptive behavior include childhood development milestones (e.g., when did the individual first crawl, walk, tie shoes, feed/dress self, etc.), as well as educational and social achievements. The judgment of an MC [medical consultant] is necessary to affirm that adaptive behavior is consistent with IQ test results.

*POMS* § DI 24515.056(D)(2). The psychological CE noted that Plaintiff's scores "were relatively consistent across measured domains" and indicated that Plaintiff "appeared to put forth a good effort, and was noted to give up more easily on Verbal subtests questions than on performance tasks." Tr. 724. The CE noted that Plaintiff wore glasses but stated that he could not see very well out of his left eye. *Id.* Plaintiff was noted to have a kindergarten grade equivalent in reading and

---

[1]    The POMS may be found at the Social Security Administration Policy Information Site, located at:  http://policy.ssa.gov/poms.nsf/partlist!OpenView.

spelling and a preschool equivalent in arithmetic.  *Id*.  The examiner opined that these findings indicated learning disabilities with the English language in the areas of reading and math and supported functional illiteracy. Tr. 724. The CE also opined that Plaintiff's IQ scores "likely reflect his history of no formal education and bilingual upbringing."  Tr. 723.

Section 12.00(D)(6) further describes the role that intelligence tests play in evaluating mental retardation for a determination of presumptive disability, noting that "[t]he  results of standardized intelligence tests may provide data that help verify the presence of mental retardation or organic mental disorder, as well as the extent of any compromise in cognitive functioning.  However, since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation."  20 C.F.R. Pt. 404, Subpt. P, App. I, § 12.00(D)(6)(a).  Thus, although Plaintiff argues that his IQ test results, if presumed constant throughout his life, are sufficient to demonstrate onset before age 22, IQ tests alone do not demonstrate "significantly subaverage general intellectual functioning with deficits in adaptive behavior."  Plaintiff's IQ scores form a part of the data necessary to verify the presence of mental retardation but function as "only part of the overall assessment."  *See* 20 C.F.R. Pt. 404, Subpt. P, App. I, § 12.00(D)(6).  The Eighth Circuit found, for example, that an ALJ may reject IQ scores that are inconsistent with a claimant's daily activities and behavior, especially when the scores are based on a one time examination by a nontreating psychologist. *See Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)(finding the ALJ properly rejected IQ scores that were the product of one meeting with a non-treating psychologist and were inconsistent with claimant's daily activities, and no medical records indicated that she was mentally retarded prior to age 22); *see also, Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991); *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986).

Plaintiff argues that even if the ALJ was not required to presume that Plaintiff's IQ had generally remained the same throughout his life, he "was wrong to hold that there was no evidence showing Mr. Rodriguez had intellectual difficulties prior to his 22nd birthday." Pl. Brief at 9. The ALJ found that there was no evidence demonstrating an onset of Plaintiff's mental impairment prior to age 22. Tr. 214. He noted Plaintiff's work history, which included semi-skilled work. *Id.* In so doing, he relied upon the testimony of the VE, who indicated that she had reviewed Plaintiff's records describing his past work. Tr. 288. Plaintiff further argues that because the ALJ took no testimony regarding what Plaintiff actually did in his last job, there is no basis for concluding that he performed this work at the semi-skilled rather than unskilled level. Pl. Brief at 10. Again, the ALJ relied on the testimony of the VE that Plaintiff had worked at the semi-skilled rather than the unskilled level. "The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Vaughan v. Shalala,* 58 F.3d 129, 132 (5th Cir. 1995). Thus, the ALJ was justified in relying on the VE's testimony.

Plaintiff further suggests that the "question of whether a claimant's level of functioning is consistent with the IQ testing is a medical question," not properly before the ALJ. While evaluation of the consistency of IQ scores and adaptive behavior is an issue for a medical consultant, the ALJ may properly consider the opinions of such consultants with the claimant's activities and work history. *Compare POMS,* § DI 24515.056(D)(2) with *Higgins v. Barnhart,* 288 F. Supp. 2d 811, 819 (S.D. Tex. 2002)(citing *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990))(finding that the claimant's ability to work as a housekeeper, despite her mental limitations, constituted additional indicia militating against a finding that her adaptive functioning was deficient to a degree that would be reasonably considered disabling). The psychological CE specifically indicated that Plaintiff's IQ scores likely reflected his history of no formal education and bilingual upbringing. Tr. 723. He also

-12-

noted Plaintiff's ability to care for his own personal needs, perform housework such as cleaning and laundry, and prepare meals, and he further noted that Plaintiff possessed a driver's license.  Tr. 725.

Plaintiff argues that the ALJ erred by failing to "shift[] the burden to the Commissioner to prove that [his] IQ was higher prior to age 22 before relying upon the absence of evidence to conclude that 12.05C was not met on a lack of duration grounds."  Pl. Brief at 9.  However, Plaintiff bears the burden at the first four steps of the sequential analysis.  *Leggett v. Chater*, 67 F.3d 558, 564 (5 Cir. 1995). The burden shifts to the Commissioner at the fifth step.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).  A claimant must prove that he meets the criteria of § 12.05C of the Listing of Impairments in order to meet his burden under step three.  *Selders*, 914 F.2d at 619 (citing *Sullivan*, 110 S.Ct. at 891-92).  Moreover, the claimant must provide medical findings that support each of the criteria for the equivalent impairment determination.  *Id*.

Plaintiff argues that the Appeals Council applied the wrong standard by requiring a diagnosis of mental retardation.  The decision of the Appeals Council after the partially favorable decision does not appear in the record.  Of course, the decision of the ALJ is the final decision of the Commissioner.  However, even assuming that the Appeals Council required a diagnosis of mental retardation, I find no error.  As noted above, Plaintiff must prove that he meets the criteria of § 12.05C of the Listing of Impairments in order to meet his burden under step three.  *Selders*, 914 F.2d at 619 (citing *Sullivan*, 493 U.S. at 521).  He must provide medical findings that support each of the criteria for the equivalent impairment determination.  *Id*.  He must demonstrate "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. Pt. 404, Subpt. P, App. I, § 12.05.  Plaintiff specifically alleges that he is presumptively disabled under §12.05C.  Under this section, "[s]tandardized intelligence test results are essential to the adjudication of all cases of mental retardation that are not covered under

the provisions of 12.05A." 20 C.F.R. Pt. 404, Subpt. P, App. I, § 12.00(D)(6)(b). While it is clear that mental retardation may be verified by evidence such as IQ tests, medical findings to support these criteria are necessary. *Selders*, 914 F.2d at 619.

Plaintiff also argues that the ALJ erred by failing to consider whether Plaintiff's impairments were equivalent to a listing. However, the ALJ indicated that he indeed considered whether Plaintiff's mental impairment met or was equal in severity to any Listing in the Listing of Impairments. Tr. 210. The *POMS* provides that "Listing 12.05C is based on a combination of an IQ score with an additional significant mental or physical impairment. The criteria for this paragraph are such that a medical equivalence determination would very rarely be required." *POMS* § DI 24515.056 (D)(1)(c). In any case, the ALJ found that there was no evidence demonstrating an onset of this impairment prior to age 22. Tr. 214. This requirement applies even where the ALJ is considering medical equivalence to 12.05C. I find that the ALJ did not err by failing to consider whether Plaintiff's mental impairment equaled Listing 12.05C.

**B.    Whether the ALJ committed reversible error by failing to evaluate Plaintiff's mental impairment under the part "b" criteria.**

If the ALJ determines that the claimant has a medically determinable mental impairment, he must specify the symptoms, signs, and laboratory findings that substantiate the presence of each impairment. 20 C.F.R.§§ 404.1520a and 416.920a. He is required to evaluate the degree of functional loss resulting from Plaintiff's mental impairments as set forth in 20 C.F.R.§§ 404.1520a and 416.920a. *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001). *Id.* The ALJ must evaluate the claimant's limitations in four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation, the part "b" criteria. A five-point scale is used to rate the degree of  limitation in the first three of those functional areas. 20 C.F.R. § 416.920a (c)(1)-(4). These four separate areas are deemed essential for work. *Boyd*, 239

F. 3d at 705 (citing 20 C.F.R. § 404.1520a(b)(3)). The written decision of the ALJ must incorporate pertinent findings and conclusions based on the technique and must include a specific finding as to the degree of limitation in each of the functional areas described.  20 C.F.R. § 416.920a(e)(2).  The Psychiatric Review Technique form ("PRTF") represents one way in which such findings may be documented.  20 C.F.R. § 404.1520a(e).  After the ALJ rates the degree of functional limitation resulting from any mental impairment(s), the judge determines the severity of such impairment(s). 20 C.F.R. § 404.1520a(d).  If the degree of functional loss falls below a specified level in each of the four areas, the ALJ must find the impairment "not severe" at step 2 of the sequential evaluation process.  20 C.F.R. § 404.1520a(c)(1).  If the ALJ finds that the mental impairment is "severe" under 20 C.F.R. § 404.1520a(c)(1), the ALJ must then determine if it meets or equals a listed mental disorder under 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00-12.09. 20 C.F.R. § 404.1520a(c)(2).  If the impairment is severe but does not reach the level of a listed disorder, then the ALJ must conduct a residual functional capacity assessment.  *Boyd*, 239 F.3d at 705.

Plaintiff contends, and Defendant concedes, that the ALJ did not address the part "b" criteria when he evaluated Plaintiff's mental impairment.   Defendant argues, however, that the failure of the ALJ to evaluate the functional limitations imposed by Plaintiff's mental impairment under the part "b" criteria does not constitute reversible error because "the ALJ's decision and his review of the evidence reveals that he did not believe that Rodriguez experienced more than two "moderate" or one "extreme" limitation.

As described in Soc. Sec. Ruling 96-8p (July 2, 1996)("SSR 96-8p), the limitations identified in the part "b" criteria "are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."  Section 12.00 of the Listing of Impairments notes that each listing, except 12.05 and 12.09, consists of a statement describing the disorder(s) addressed by the listing, paragraph A criteria (a set of medical findings), and

paragraph B criteria (a set of impairment-related functional limitations).  *See* 20 C.F.R. Pt. 404, Subpt. P, App. I, § 12.00.  This section notes that the part "b" and "c" criteria describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity.  *Id*.  It notes that the functional limitations indicated under parts "b" and "c" must be the result of the mental disorder described in the diagnostic description, manifested by the medical findings.  *Id*.  However, "[t]he structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings.  Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation.  It also contains four sets of criteria (paragraphs A through D)."

Section 416.920a(d)(2) describes the evaluation of a severe mental impairment at step 3 of the sequential evaluation process noting that the adjudicator determines if the mental impairment meets or is equivalent in severity to a listed mental disorder "by comparing the medical findings about your impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder."  *See* 20 CFR § 416.920a(d)(2).  The ALJ found that Plaintiff's mental impairment was "severe" under the applicable regulations at step 2 of the sequential evaluation process.  At step 3, the ALJ found that Plaintiff's mental impairment did not meet or equal in severity the criteria of § 12.05C of the Listing of Impairments.  Tr. 214.  In making his RFC assessment, the ALJ found that Plaintiff's intellectual functioning limited him to simple, repetitive work.  Tr. 215.

Defendant argues that the failure of the ALJ to evaluate Plaintiff's mental impairment under the part "b" criteria was a harmless error. Def. Brief at 11. Plaintiff indicates that this argument misses his point — that by failing to make the part "b" findings, "the ALJ disregarded medical evidence from Dr. Brown demonstrating that Mr. Rodriguez was seriously limited in numerous areas of functioning." Pl. Reply at 7.  Plaintiff points to a medical assessment of ability to do work-related

activities form completed by Dr. Brown.  Tr. 726-27.  Dr. Brown indicated that Plaintiff had a poor

ability to function independently, deal with work stress, and understand, remember, and carry out

complete and detailed, but not complex, instructions.  *Id*.  Dr. Brown also indicated that Plaintiff's

abilities in all other identified areas were fair, including the ability to follow work rules, relate to

coworkers, deal with the public, use judgment, interact with supervisors, maintain

attention/concentration, understand/remember/carry out simple job instructions, maintain personal

appearance, behave in an emotionally stable manner, relate predictably in social situations, and

demonstrate reliability.  *Id*.  Plaintiff argues that by failing to make the part "b" evaluation, the ALJ

"did not make affirmative findings that Mr. Rodriguez did not have the limitations described by Dr.

Brown in his report."  Pl. Reply at 7.

Given the structure of Listing 12.05C, the failure of the ALJ to evaluate Plaintiff's mental

impairment under the part "b" criteria did not materially affect the ALJ's determination that

Plaintiff's impairment was severe at step 2 (the ALJ, indeed, found it was a severe impairment), nor

did it materially affect the determination at step 3 that Plaintiff's mental impairment did not meet

the criteria for presumptive disability under this Listing.  Plaintiff essentially argues, however, that

the failure of the ALJ to evaluate Plaintiff's impairments under the part "b" criteria affected his RFC

assessment.

SSR 96-8p specifically notes that the evaluation under the part "b" criteria, used at steps 2

and 3, is distinct from the RFC finding used at steps 4 and 5 of the sequential evaluation process.

The Ruling further notes that the " RFC is an issue only at steps 4 and 5 of the sequential evaluation

process."  *Id*.

As Defendant correctly notes, "procedural perfection in administrative proceedings is not

required."  *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988).   The court will not reverse the

decision of an ALJ for lack of substantial evidence where the claimant makes no showing that he

was prejudiced by the deficiencies he alleges. *Carey v. Apfel*, 230 F.3d 131, 143 (5th Cir. 2000)(citing *Brock v. Chater*, 84 F.3d 726, 729 (5th Cir. 1996)). Procedural improprieties will constitute a basis for remand "only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).[2]

Functional limitations are evaluated on the PRTF to determine the extent to which the mental impairment(s) interferes with the claimant's ability to function independently, appropriately, effectively, and on a sustained basis. 20 CFR § 404.1520a(c)(2). "Residual functional capacity" refers to the ability to perform work despite physical or mental impairments. 20 C.F.R. § 404.1545a. While findings of impairment under the part "B" criteria would clearly be relevant to the RFC determination, a finding of such impairment at step 2 does not require that such an impairment be incorporated into the RFC finding if the ALJ finds that the impairment does not limit the claimant's ability to perform work.

The operative question, therefore, is whether the RFC assessment and the hypothetical questions posed to the VE incorporated all of the limitations resulting from Plaintiff's impairments that the ALJ accepted. *See Bowling v. Shalala*, 36 F.3d 431, 435-36 (5th Cir. 1994)(no reversible error where the hypothetical presented reasonably incorporated the limitations accepted by the ALJ and claimant's representative had the opportunity to present questions incorporating additional limitations).

---

[2]     Plaintiff argues that the applicable standard permits a finding of harmless error "only if the court can confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way, citing *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004). The court relies upon the definition of harmless error described by the Fifth Circuit in *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988) and its progeny.

The ALJ found that Plaintiff's RFC for work at the light exertional level was limited, in pertinent part, to simple, repetitive work and further found that this was consistent with his intellectual functioning and past work history. Tr. 215. The ALJ found that Plaintiff had a second grade education and was apparently illiterate, although he was capable of speaking and understanding the English language. Tr. 216. The ALJ presented the VE with a hypothetical person of the same age, education, and vocational history as Plaintiff, who retained the ability to perform light work, limited to a 15-pound weight restriction on lifting/carrying; no overhead use of the upper extremities; no climbing of scaffolds or ladders or crawling; limited to simple repetitive work, with work instructions to be communicated orally in simple English; and which required only occasional bending, reaching, kneeling, and squatting. Tr. 216-17; 260-61. The VE testified that the jobs identified were "all simple and repetitive. The same task on a repetitive basis." Tr. 261. She further testified that the identified jobs were "perhaps even simpler than the [Plaintiff's] past work. They are basically one- or two-step tasks." *Id.* Plaintiff's representative was permitted to present the VE with hypothetical questions which included additional proposed limitations. Tr. 262-63. The ALJ ultimately did not accept these additional proposed limitations. Tr. 217.

Dr. Brown indicated in his report of the psychological consultative examination that Plaintiff indicated no prior contact with mental health professionals. Tr. 722. Plaintiff reported that he has a few friends, watches television and listens to the radio, has a good marriage, and reported no significant temper. Tr. 723. Dr. Brown noted Plaintiff's report of being relatively free of any significant mood disorder. Tr. 724-25. Dr. Brown opined that Plaintiff's diagnoses included math and reading disorders, as well as an occupational problem on Axis I;[3] mildly mentally retarded to

---

[3]       The axial system of evaluation is used to facilitate comprehensive and systematic evaluation with attention to the various mental disorder; general medical conditions; psychosocial and environmental problems; and level of functioning. *See generally, American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 27. An Axis I diagnosis

borderline range of intellectual functioning on Axis II, and a Global Assessment of Functioning ("GAF")[4] score of 55[5] on Axis V.

Plaintiff argues that the record demonstrates that he had problems in numerous broad areas which the ALJ failed to consider.  However, the record indicates that the ALJ questioned the VE about the work identified and the skills needed, particularly as compared to Plaintiff's previous work.  The record further indicates that Plaintiff's representative was permitted to examine the VE and present hypothetical questions incorporating proposed limitations.  The record also indicates that the limitations noted in Dr. Brown's detailed report were consistent with the ALJ's RFC assessment and questioning of the VE.  I find that although the ALJ did not evaluate Plaintiff's mental impairment under the part "b" criteria, such failure did not constitute reversible error.

**C.     Whether the ALJ's RFC assessment was supported by substantial evidence where the ALJ considered all of the evidence in one analysis and did not consider that Plaintiff's impairments were worse prior to his corrective surgeries.**

Plaintiff argues that the ALJ erred in making his physical RFC assessment by considering all of the evidence in one analysis, in a case that had been pending for six years.  Plaintiff argues that the ALJ should have considered evidence demonstrating that Plaintiff's physical impairments were worse prior to his corrective surgeries. Plaintiff essentially argues that the ALJ should have considered the limitations imposed by his impairments before and after his corrective surgeries,

---

is used to report all clinical disorders except for personality disorders and mental retardation, which are reported on Axis II.  *Id* sat 27-28.

[4]      The GAF score on Axis V is for reporting the client's "psychological, social, and occupational functioning." *See American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 32.  This report of overall functioning is noted to be "useful in planning treatment and measuring its impact, and in predicting outcome."  *Id.*

[5]      The DSM-IV defines a GAF of 51-60 as moderate symptoms (e.g. flat effect, circumstantial speech, and occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers). *American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 32.

should have incorporated limitations into his RFC assessment which existed prior to the corrective surgeries, and should have incorporated such limitations into the hypothetical questions posed to the VE.

The ALJ indicated in his opinion that he concluded that Plaintiff had been disabled since June, 14, 2002, but not prior to that date. Tr. 209. The ALJ extensively discussed Plaintiff's medical history. Tr. 210-214. He noted Plaintiff's history of neck and back pain, dating back to at least 1991, his disketomy and fusions, his on-the-job injuries, and various other treatments and tests, including physical therapy, injections, and CT scans. Tr. 210. The ALJ noted RFC evaluations performed in May 1996, indicating that Plaintiff regained the ability to perform a wide-range of medium exertional activities, and in August 1997, indicating that Plaintiff could lift up to 40 pounds occasionally and up to 20 pounds frequently, could sit for four to six hours, stand for four to six hours, and walk for two to three hours during a routine, eight-hour workday. *Id*.

The ALJ also addressed the Plaintiff's allegations of being virtually unable to use his upper extremities since his alleged onset date. Tr. 211. He noted that Plaintiff reported numbness and tingling in his upper extremities, left cervical and scapular pain, intermittent left shoulder pain, and some central lumbar and intermittent left thigh and calf pain. *Id*. The ALJ noted results of testing in which Plaintiff scored positive for inappropriate illness behavior on two of four categories tested, and he noted other information suggesting that Plaintiff engaged in more activity than he acknowledged. *Id*. He also noted a functional capacity evaluation indicating that Plaintiff could perform activities at a level between sedentary and light exertion, with a limitation on lifting/carrying no more than 15 pounds, occasionally sitting, and frequently standing/walking. *Id*. The ALJ noted Plaintiff's complaints before, and the results of, his ulnar release surgery. Tr. 211. He also noted Plaintiff's additional complaints of pain and his seeking emergency treatment for right hand pain after getting his hand caught between a car's motor and the frame of the car. *Id*. He also

discussed Plaintiff's surgery to repair his torn rotator cuff. *Id*. He considered the notation by a treating physician who indicated that Plaintiff was unable to work due to an impingement of the left shoulder and left cervical/lumbar radiculopathies and his indication that Plaintiff's left arm was useless in abduction.  Tr. 212.  The ALJ also discussed a February 2001 functional capacity evaluation which indicated that Plaintiff could not meet his prior employer's job demands.  *Id*.

Plaintiff noted that the ALJ found in November 1998 that Plaintiff suffered from chronic cervical radiculopathy and bilateral ulnar palsy that restricted his fine dexterity and his ability to use his upper extremities.  Plaintiff argues that even if the ALJ is justified in finding that his hand impairment improved significantly after the surgery, this "does not justify the ALJ's conclusion that Mr. Rodriguez did not have a hand impairment between 1995, his alleged onset date, and January 2000."  Pl. Brief at 15.

Plaintiff's alleged amended onset date is November 13, 1998. Tr. 209. Although the ALJ determined that Plaintiff had no hand impairment, he found that Plaintiff's impairments included his history of left elbow entrapments, left shoulder rotator cuff tear, both status post surgical intervention.  *Id*.  The ALJ discussed Plaintiff's medical treatment, clinical findings, and reports of symptoms.

Plaintiff testified that since his surgeries, he was unable to lift his arms over his head with weight on them. Tr. 240.  He also testified that he experienced cramping when he used his hands all the time. Tr. 242.  He indicated that his shoulder was no better since his surgery and that it hurt all the time and had not worsened or improved. Tr. 245, 269.  Plaintiff testified that he continued to have numbness in his hands and fingers and trouble gripping and holding things. Tr. 284.  The ALJ found that Plaintiff has impairments which could reasonably be expected to produce the type of pain he alleged but further found that his complaints suggested a greater degree of impairment than was established by the objective medical evidence. Tr. 214. The ALJ declined to accept the statement

-22-

of disability by a treating source, referred to the various functional capacity evaluations performed, and noted that Plaintiff apparently engaged in some symptom magnification and had twice visited local emergency rooms for injuries from activities inconsistent with his subjective complaints that he was unable to perform virtually every type of task.  Tr. 214-15.  The ALJ specifically found that Plaintiff had exaggerated both the nature and severity of his subjective complaints.  Tr. 215.

Plaintiff argues that substantial evidence does not support a finding that Plaintiff's shoulder impairment was not more limiting prior to his surgery than it was afterwards.  Pl. Brief at 16.  Prior to remand by the United States District Court, the ALJ found that Plaintiff retained the RFC to perform light work with no requirement for fine manual dexterity or fine visual acuity which does not involve more than occasional use of the upper extremities.  Tr. 23.  Plaintiff argues that the ALJ should have incorporated this limitation into his RFC assessment and into the hypothetical questions posed to the VE in this matter. However, in examining the decision of the ALJ which constituted the final decision of the Commissioner and which is before the Court now, it is apparent that the ALJ considered the evidence in the record concerning Plaintiff's hand and shoulder impairments and incorporated those limitations that he accepted for the RFC assessment and into the hypothetical questions posed to the VE.  Some of the evidence considered by the ALJ post-dated his previous opinion, including the evidence of Plaintiff's emergency room treatment for injuries to his hand, and was clearly considered in making his credibility determination. The ALJ is not required to incorporate any specific limitations into his RFC assessment simply because it appears in a medical opinion.  Rather, the ALJ has the sole responsibility for weighing the evidence, may choose whichever physician's diagnosis is most supported by the record, and may incorporate into the RFC assessment the limitations supported by that diagnosis or diagnoses.  *See Muse*, 925 F.2d at 790. The ALJ also has the responsibility to resolve questions of credibility and questions arising from conflicting medical opinions.  *Masterson*, 309 F.3d at 272.

The ALJ's RFC determination is consistent with his credibility finding and is supported by substantial evidence in the record.  The record demonstrates that the ALJ appropriately considered Plaintiff's severe impairments in determining that Plaintiff retained the RFC for a limited range of light work and did not err by failing to make findings of additional limitations resulting from Plaintiff's hand/shoulder impairments prior to surgery.

Therefore, I find that the ALJ did not err and his decision is supported by substantial evidence in the record.

## IV.    CONCLUSION

Based upon the foregoing discussion of the issues, the evidence, and the law, this Court recommends that the United States District Judge affirm the Commissioner's decision and dismiss the Plaintiff's Complaint with prejudice.

The United States District Clerk shall serve a true copy of these findings, conclusions, and recommendation on the parties.  Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within ten days after being served with a copy.  A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory, or general objections.  A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a *de novo* determination by the District Court.   *See Thomas v. Arn*, 474 U.S. 140, 150, 106 S. Ct. 466, 472 (1985).  Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the United States Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).

DATED this 15th day of September, 2004.

**PHILIP R. LANE**
**UNITED STATES MAGISTRATE JUDGE**